DARLING and others, appellants, *v.* ROGERS and others, respondents, 22 Wend. 483.

### *Appeal from Chancery.*

In November, 1836, Thomas Darling made an assignment of all his real and personal estate to assignees, in trust for his creditors. The assignment stated that the object of the assignor in its execution, was to make over and secure to his creditors, or to the assignees in trust for them, all his estate real and personal. The trusts declared were that the assignees should, with all due diligence, sell and dispose of the estate, real and personal, at auction or private sale, for the most that could be got, or to *mortgage* the real estate or any part thereof, as they should deem most advisable and best calculated to be the most productive and advantageous; collect the debts; and from the proceeds after deducting costs, charges, and expenses, pay certain preferred creditors whose debts were estimated at $70,000, and with the residue of the proceeds, pay and satisfy his remaining creditors.

In October, 1837, the respondents filed a judgment creditor's bill, charging the assignment to be fraudulent, praying for a discovery, for a receiver, and an injunction to restrain the assignees from selling, mortgaging, or encumbering the property assigned to them. The assignor and assignees put in separate answers denying all fraud, &c. Upon a motion on the part of the complainants for a receiver, and of the defendants, to dissolve the injunction, the Chancellor made an order adjudging that no estate in the real property of Darling, vested in the assignees by virtue of the assignment to them, and ordered the appointment of a receiver, &c. The injunction so modified it, as to authorize the assignees to sell the real estate with the approval of the receiver. In respect to the personal property, the injunction was wholly dissolved.

From this decree Darling and his assignees respectively appealed. An opinion in the case was delivered by Cowen, J., who said, " The trust declared was, it is admitted, valid in respect to the personal estate; and would have been equally so of the real estate, for the purpose of selling it,

had it been confined to that. The 55th section of the article of trusts, allows express trusts: 1. To sell lands for the benefit of creditors. 2. To sell, mortgage, or lease lands for the benefit of legatees or for the purpose of satisfying any charge thereon." The article no where authorizes, in terms, an express trust to *mortgage* lands for the benefit of creditors; and though as a general rule, a trust to sell lands and distribute the proceeds, shall be construed liberally, and might include a power to mortgage,* yet when the two subdivisions are read in connection, there is great difficulty in saying that the legislature did not (in the first section) use the words, "to sell lands in their strict sense, which would only confer the power to give a deed of bargain and sale." He declines to decide whether it might avail as a power in trust. (p. 486–487.)

He pursues. My opinion is that it can not be allowed as an express trust. But then the more material inquiry arises whether a failure in this particular shall destroy the whole deed. A clause has found its way into this instrument by which the assignees may sell, but the scrivener has added what is perfectly void, that the trustees may also mortgage." He refers to what was said by Gibbs, Ch. J., in *Thompson* v. *Pitcher*, 6 Taunt. 369, who said, "I can not find in this act of parliament any words which make the entire deed void. I think this grant of that interest in land, which by the terms of the grant is to be applied to a charitable use, is void; but I think the statute makes nothing more void, and that the deed, so far as it passes other lands, not to a charitable use, is good." This deed is consistent with the rules of law, Mr. Justice Cowen concludes, in all except the trust to mortgage. The Chancellor so regarded it, in respect to the personal es-

---

* ☞ This implied power to mortgage under a power to sell, which is said to be a " conditional sale," (*Mills* v. *Banks*, 3 P. Wms. 9,) seems however to be confined to cases where the power is to sell to raise a particular sum ; as a power to " raise a sum," out of an estate, enables a sale of it. Sugden on Powers, 392. But it is doubtful, if a mortgage be first made, whether the power to raise by sale or mortgage, is not wholly exhausted ; and if the parties intend that a sale should be afterwards made, the intention should be clearly expressed." Ibid.

tate. I think he should also have included the real estate, and the trust to sell. He did not in my opinion go far enough; and therefore the decree should be reversed.

Mr. Senator Verplanck delivered an opinion in which he concurs with Mr. Justice Cowen in the result, but holds that the trust to mortgage given by the assignment, not only did not vitiate the whole instrument, but on the contrary was a good trust by the 2d clause of the 55th section of the article of trusts, under the terms, "to satisfy any charge," upon lands: that the assignees in this case might lawfully mortgage to pay off a lien by judgment, &c., on the lands assigned. And of this opinion was the whole court; as the decree of the Chancellor was unanimously *reversed;* and the following resolution adopted, was incorporated into the decree; as follows:

"It is further ordered, adjudged and decreed, that an assignment of real estate, in trust, to sell or mortgage for the benefit of creditors at large, is valid for the purpose of selling, though void for the purpose of mortgaging: also, that if any of the creditors have judgments, mortgages or other charges on such estate, the trust to mortgage is valid so far as it seeks to pay or secure the same; or to mortgage a part of such assigned estate to pay an incumbrance on such part, though it be void for the purpose of paying or securing creditors at large."

---

☞ In the case of *Kane and Wife, appellants* v. *Gott and others, respondents,* the principle that a will may be void in part, and yet good for the residue, and that the portions not contrary to law will be saved, was fully recognized and acted upon by the Chancellor, (7 Paige, 521,) and his decree was unanimously affirmed by the Court of Errors.

Cowen, J., speaking of some "remote collateral provisions," as he calls limitations as to income to unborn persons, which were admitted to be void, and from which it was argued that the whole will was void, says, "Nothing is better settled than the direct contrary; and the contrary was held by this court in the late case of *Darling* v. *Rogers.*" *Kane* v. *Gott,* 24 Wend. 641.

The other cases which have come before the Court of Errors, and the Chancellor upon questions arising under the statute of trusts, since the foregoing decisions on those questions by them respectively, are those of *Depeyster* v. *Clendining*, 8 Paige, 295, reported in the Court of Errors, under the title of *Bulkley* v. *Clendining*, 26 Wend. 21, where the decree of the Chancellor was affirmed; *Van Veghten* v. *Van Vechten*, 8 Paige, 105; *Parks* v. *Parks*, 9 Paige, 107, in which an appeal was taken, and the Chancellor's decree unanimously affirmed in December, 1842; *Irving* v. *De Kay*, 9 Paige, 521. In this the Chancellor takes occasion to say, "I consider it conclusively settled by the decisions of the court of dernier resort, confirming the decrees of this court in the cases of *Gott* v. *Cook*, and of *Van Veghten*, that any legal trust is sufficient to sustain a devise or conveyance to the trustee of an estate commensurate with the trust, without reference to the illegal trusts which the testator or grantor has attempted to create in the same estate. And since the decision in December, 1839, of the case of *Darling* v. *Rogers*, the Court of Errors has steadily adhered to and acted upon those cardinal and conservative principles in the construction of devises and conveyances in trust, which were stated and intended to be acted upon by this court in the case of *Hawley* v. *James*, but which the appellate court thought were misapplied by this court in relation to the trusts of Mr. James's will. The principles stated in that case, and which are now the settled rules of law, are, that the intention of the testator, when it shall have been ascertained from an examination of the will in connection with the situation of his property, &c., at the time of making such will, must be carried into effect by the courts, so far as that intention is consistent with the rules of law; that although some of the objects for which a trust is created, or some future interests limited upon the trust estate, are illegal and invalid, if any of the purposes of the trusts are legal and valid, and would have authorized the creation of such an estate, the legal title vests in the trustees during the continuance of such valid objects of the trust, except in those cases where the legal and valid are so mixed up with those which are illegal and void, that it is impossible to sustain

68

the one without giving effect to the other. And that every disposition by the testator of an estate or interest in the rents, profits or income of his real or personal estate, and every trust in the will, which, if valid, would have the effect of rendering the property inalienable for a longer period than is allowed by law ; and every remainder or other future estate or interest, limited upon the trust which would have that effect, must be considered and treated as absolutely void and inoperative in determining the validity of a devise of the legal estate to trustees, or the validity of any other provision of the will." p. 528.

☞ Although seventeen years have elapsed since the Revised Statutes went into operation, it may be very well questioned whether our courts have made much greater progress in settling the construction of our new statute of trusts than the English courts had made, in the time of Lord Bacon, towards " a true and sound exposition," as he expresses it, of the Statute of Uses. 27 Henry VIII. c. 10. That statute, " an act concerning uses and wills," was passed in 1536. In 1700, Lord Bacon, then Mr. Francis Bacon, one of Her Majesty's counsel, writes, that in 37 Reginæ, which was but five years before, " by the notable judgment of all the judges assembled in the Exchequer Chamber, in the famous cause between Dillon and Freine, concerning an assurance made by Chudleigh, (Chudleigh's case, 1 Rep. 121,) this law began to be reduced to a true and sound exposition, and the false and perverted exposition which had continued for so many years, grew to be controlled." (Bacon on Uses, p. 2.) An interval of 60 years had thus elapsed from the time that important act took effect, before it began to be reduced to " a true and sound exposition." And five years after, that " famous case" of Chudleigh, when Sir Francis commenced his lecture called his " Reading upon the Statute of Uses," (according to the original meaning of *lecture,*) he assigns as his reason, for choosing " to read on that statute, that it was " a law whereupon the inheritances of this realm are tossed at this day, like a ship upon the sea, in such sort that it is hard to say which bark will sink, and which will get to the haven ; that is to say, what assurances will

stand good, and what will not." Whether our statute of trusts is doomed to wait so long to be "reduced to a true and sound exposition," is a question that must be resolved by posterity. For who shall say that other cases under our statute, now passing current, may not ere long, as well as *Root* v. *Stuyvesant*, be classed with those "false and perverted expositions " which had continued," says Sir Francis, "for so many years, though never countenanced by any rule or authority of weight?" The statute of Uses, (27 Henry VIII.,) is a plain and simple, and not very comprehensive one, compared to our new statute of Estates and Trusts to say nothing of Powers. The few but difficult cases that have arisen under it which have been adjudicated upon by our courts, suffice to show that, as Sir Francis expresses it, " as it cometh to pass always, upon the first reforming of inveterate errors, many doubts and perplexed questions have arisen which are not resolved, nor the law thereupon settled." Now, if our courts suppose that they have reached *terra firma* in the construction of our statute of trusts, or are any nearer the haven than the English courts in the time of Lord Bacon and good Queen Bess, they will only claim to have done much more in seventeen years than the courts at Westminster were able to do in four times that period. To correct any such pretension, let them but look at the contrariety of opinions in the foregoing cases as they have successively arisen; not only a contrariety between different courts, but between judges of the same court. Let them then look at some of the startling questions that may arise out of their decisions, be they ever so correct in these particular cases; questions that not only may, but must necessarily arise from the ever varying facts and circumstances attending each new cause that presents itself. Looking at those, we find ourselves still "tossed like a ship upon the sea," though our judges are doubtless entitled to the same credit which Sir Francis awards to the judges during the period of which he speaks. " Neither is this any lack or default in the pilots—the grave and learned judges—but the tides and currents of received errors and unwarranted and abusive experience have been so strong, as they were not able to keep a right course, according to the law." These tides and currents were certainly

too strong for our pilots, the grave and learned judges, in the case of *Root* v. *Stuyvesant ;* and though, in that case, they did not differ, yet in others they have not always agreed among themselves as to what point of the compass they should steer to " keep a right course according to the law."

It would be an idle, if not an unpardonable presumption in us, to attempt to seize the helm in the midst of this voyage of exploration and discovery, pretending either that we see land, or that our pilots have been sailing on a wrong course. On the contrary, waiving the metaphor, instead of venturing to pronounce upon all or any of the opposite conclusions arrived at in the foregoing cases upon the statutes of estates, trusts, and powers, by the Court of Errors and the Court of Chancery, it would require a volume to review them as their present importance as precedents would demand ; and, with the prospect of a " Code Civil" before us at an early day, which, it is to be devoutly wished, may sweep the complex, and in some instances contradictory provisions of those three statutes out of existence, it would seem to be of very doubtful future benefit to bestow any great labor of analysis or comparison upon them. When we say that some of those provisions are contradictory, we speak rather of the contradictions found in them between their spirit and intention, as professedly developed in the provisions so carefully guarding against suspensions of the power of alienation, for instance ; and those provisions, on the other hand, which have imposed so many new clogs and fetters upon the transfer of real estate.

Before the statute, tenant for life of a trust estate could join with the trustee and remainder-man, and convey a fee in possession. Now if the trust be a valid one, to receive the rents and profits of land, and apply them to the use of the tenant for life, neither trustee nor *cestui que trust,* nor both together, though ever so well agreed, can get rid of their respective estates. It was Justice Twisden, if we recollect rightly, who said in some case before him, according to the reporter, " you can not put an estate into a man in spite of his teeth ;" but if Mr. Justice Twisden had lived to see our statute of trusts, he would have seen not only that an estate may be put into a man in spite of his teeth, but

kept there too ; and though you pull out all his teeth, you
can not extract the estate out of him. No allowance made
for change of circumstances, no discretion given to the trus-
tee as to the expediency of selling the estate for life, and
vesting it in other property, more productive and more easily
managed by the trustee; but there the estate has been put,
and there it must remain ! And all this in a statute which
is so astute to preserve the ready alienation of real property !
Nay, it is doubtful even whether the testator or grantor in
such a case, could himself confer the power or, if you
please, 'power in trust.' (A vile phrase.) It would certainly
be held void if such a narrow spirit of construction prevailed
as has been manifested in regard to some of the clauses of
this statute. For would it not be contended and with at
least, color of argument, that though a trust or a power to
sell real estate be authorized by those statutes, yet that must
be taken to be to sell that which the statute has not rendered
inalienable ? Now, whether the statute really was intended
to restrain a trustee, who in good faith, for the benefit of and
in conjunction with the tenant for life, should desire to part
with such a trust estate, and invest the proceeds in govern-
ment stock, upon the same trusts, and to thus absolutely
prevent them from conveying their interest to the remainder-
man, and by uniting the two estates, give the land a market-
able value—we can not since the case of *Lorillard* v. *Coster*,
venture to question. But, we dare ask, ought so absurd and
mischievous a provision be allowed to stand. What can be
in general so disadvantageous to the improvement of real
estate, whether vacant city lots, or half cultivated and per-
haps wild lands, as to subject them to the uncertain tenure
of a life estate ? It is true a power to lease for twenty-one
years, if given by the will or grant, would remove a part of
the difficulty ; but still the clog of total inalienability ren-
ders it impossible for the remainder-man or his grantee, to
purchase at any price with a view to make extensive and
permanent improvements. Then again, the provision that
" a contingent remainder shall not be created on a term of
years, unless the nature of the contingency on which it is
limited, be such that the remainder must vest in interest,
during the continuance of not more than two lives in being

at the creation of such remainder, or at the termination thereof." (§ 20th, Division of Estates.) What is the object of such a provision? Let the grammatical question pass; though it certainly does read, " that the remainder shall not vest until the termination of the remainder" itself, if we do not go back to the beginning and search with some care for the antecedent of " thereof." But if the object of this section was to prevent that dreaded suspension of the power of alienation for a long term of years, while the remainder was yet contingent, why not, in the name of common sense, and of that policy which is so anxious upon the subject of suspension, at once fix a term of years, which in no event or contingency should be exceeded? Why not give a reasonable certainty, instead of an unreasonable uncertainty? Why suspend the power of alienation by one or two threads, so that the tenant of the trustee or owner of such a term, must be all the while in the condition of poor Damocles, when it was so easy to prescribe a precise term upon which a contingent remainder might be limited?

These same remarks apply to the 21st section, which also, to guard against some unknown and dreaded mischief, provides that " No estate for life, shall be limited as a remainder on a term for years, except to a person in being at the creation of such estate." Now, if the 20th section had but fixed the exact duration of the term for years, upon which a contingent remainder might be limited, it is easy to see that this section would have been wholly unnecessary, so far as the idea of suspension of alienation is concerned. But by itself as it stands, what purpose was it intended to answer? You may limit a fee upon a life estate for two lives, to twenty or twenty thousand unborn remainder-men, if you happen to have the fee, and desire to create so many remainder-men; but if you have a lease-hold estate for fifty or a hundred years, you cannot be permitted to say your eldest son shall enjoy it during ten years, and if his younger brother who will then be of age, shall attain twenty-one, he shall then come into possession of it, and enjoy it for life! Was ever any thing better contrived than these two sections, to produce that uncertainty of tenure and enjoyment, which the policy of the law as much abhors, as the suspen-

sion of alienation itself? And if the testator went further and said, that in case his younger son did not attain the age of twenty-one, then the term to go to the children of the eldest son, if he should marry and have issue—all these limitations would be impossible by these sections; and yet what mighty mischief, if the preceding term were limited to twenty-one years, could have been foreseen by the legislature, which prompted them to prohibit these convenient and harmless dispositions upon terms for years ?

Then as to the *construction* of these two sections : A testator wishes to give an estate for a term certain, say ten years, in his fee simple estate, to one of his children, to answer a particular family purpose, and not to subject it to the uncertainty of life estates, and then to devise the estate to two other sons for their lives, and to their children or grandchildren in fee at the end of the term, in case the sons should be dead. Now, what possible or probable mischief could come of such a disposition, or what more danger of perpetuities, in such a case, than if the term of ten years was not interposed ? The two lives are running on with the term, and the estate must vest at their termination, in their heirs at law as remainder-men, which the statute permits. Now, how does the term prolong the lives, or the lives prolong the term, so as to bring such a case within the range of illegal suspension ? And yet, according to the system of 'strict construction' of these statutes, the estates for life would be good, and the remainders void. The term for ten years remains in the eldest son, the two lives are gone, and yet we have to wait till the end of the term to see who shall take. To be sure, this might be guarded against by a provision that the remainders to the children and grand-children should vest on the death of the two sons ; but the testator not having made these statutes his special study, or perhaps even, if he be not *inops consilii*, his counsel not having the fear of the 20th and 21st sections before his eyes, makes that unfortunate slip ; and away go the estates in remainder, taking with them only one-third of the provision made for the descendants of the younger sons, it is true, in the case put. But suppose the remainder-men not heirs at law ? Then not a *scintilla juris* remains in them. Did

the legislature ever intend any such absurd consequence as this ? It cannot be.

Though this may seem like questioning some of the foregoing decisions on this point, we disclaim any such intention. On the other hand, our sole intention is to show that such a senseless restraint upon testamentary or other dispositions of real estate, ought not to remain in our statute book. Fix the precise term upon which contingent remainders may be limited at as short a term as you please, but do not perforce oblige every disposition of real estate upon which they may be limited, to be of that precarious and most disadvantageous species—a mere tenure upon one or two lives. If ten or twenty might be inserted, there would be a chance of something like stability, and some encouragement to improvements, but since that also is decided to be against public policy, or at all events against the statute, it surely deserves the consideration of legislative wisdom whether a term of twenty-one years, or of some other reasonable duration, ought not to be substituted for the interest of all parties, and of the public, for this wretched tenure of one or two lives.

Other provisions there are to be found in these statutes which equally require the pruning hook. For instance ; the whole of the 55th section of the statute of Trusts, which undertakes to define all the objects and purposes for which express trusts may be created, might without at all impairing the policy of the law, be very well spared. The provision of the 45th section that " every estate and interest in lands shall be deemed a legal right cognizable as such in the courts of law, and that of the 47th converting all estates in trust, in effect, into legal estates, would seem to be all that was necessary to provide in regard to the nature of the estate, so as to put an end to all trusts where the trustee is considered as a mere conduit of conveyance. Then, the reservation in the 48th section, that " these provisions shall not divest the estate of any trustees, in any existing trust, where the title of such trustees, is not merely nominal, but is connected with some power of actual disposition or management, in relation to the lands which are the subject of the trust," if it had been extended to trusts hereafter to be created, would

appear to be sufficient to preserve all future legal trusts of that description, and to define their character and limits with sufficient accuracy. "The power of actual disposition or management," if a good enough definition for existing trusts which are thus reserved, would seem to have been a sufficient one also for trusts thereafter to be created. Every additional word in the statute on this subject has but multiplied doubts; and one doubt is often the mother of twenty more: for if a doubt arise upon a certain clause of a statute, all the clauses in any way connected with it, generally partake of the same difficulties of construction. They even go on in an arithmetical progression, in some instances of statutory construction. Take the 2d clause of the 55th section, "To receive rents and profits and apply them to the use of any person," nobody denies that equivalent expressions may be used in creating a trust, and that where they are used, an estate vests; but it has not yet been decided whether as Chief Justice Savage, and Mr. Justice Bronson hold, a trust, "to receive rents and profits, and pay over," is or is not an equivalent expression; and if not, then what is to become of the estate, is a question hardly yet mooted. Does it vest in the beneficiary under the provisions of the 45th and 47th sections, or is it void? Is the estate executed in the donee in possession by the statute, "as a legal estate, of the same quality and duration, and subject to the same conditions as his beneficial interest," in the words of the statute, or is the trust valid as a mere power in trust to the trustee, or if the power is a nullity, is the beneficial interest of the *cestui que trust* gone? These will lead again to the enquiry who is to be considered as "entitled to the actual possession of lands, and the rents and profits?"

But we are again "tossing like a ship upon the sea," getting among tides and "currents of received errors," which we do not care to encounter. In fact, the voyage must be of a most uncertain duration, to however skilful a navigator undertakes to explore and survey those foggy latitudes, without further maps and charts than we yet have; and he had need be a Columbus, who attempts to penetrate into those unknown regions beyond, into which no explorer has yet ventured. But it is time to conclude our desul-

69

tory observations upon these statutes ; which we do with the anxious hope that nothing we have said upon the difficulties and doubts attending their construction, may discourage the " diligent student" from endeavoring to master them.  We pray in all sincerity, that he may find and send us all a good deliverance from the doubts and difficulties to which they have given rise.